FILED
CLERK U.S. DISTRICT COURT

MAY 1 7 2012

CENTRAL DISTRICT OF CALIFORNIA
BY _____ DEPUTY

JS-6

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

In re                                    )   Case No. 2:10-CV-5445 SVW
                                         )
DAEWOO MOTOR AMERICA, INC.,              )   Bankruptcy Court Case No.
                                         )   2:02-24411-BB
          Reorganized Debtor             )
                                         )   Chapter 11
                                         )
_____)   Adversary Proceeding No.
                                         )   2:03-2155-BB
Daewoo Motor America, Inc.,              )
                                         )
               Plaintiff,                )
                                         )
          v.                             )
                                         )
Daewoo Motor Co., Ltd.,                  )
                                         )
               Defendant.                )
_____)

     Daewoo Motor America, Inc. appeals a final judgment by the United

States Bankruptcy Court for the Central District of California in its

adversary proceeding against Daewoo Motor Company, Ltd.  For the

reasons set forth below, the judgment of the bankruptcy court is

AFFIRMED.

## I.   INTRODUCTION AND PROCEDURAL BACKGROUND[1]

Daewoo Motor America, Inc. ("DMA") was established in June 1997 as a wholly-owned subsidiary of Daewoo Corporation.  On December 31, 1998, Daewoo Corporation sold 100% of its interest in DMA to its affiliate, Daewoo Motor Company, Ltd., a South Korean automobile manufacturer. Throughout this Order, the Court will refer to both Daewoo Motor Company, Ltd. and its predecessor-in-interest Daewoo Corporation as "DWMC."  DMA served as DWMC's exclusive distributor of Daewoo automobiles in the United States, and provided warranty services and replacement parts to U.S. Daewoo dealers.

### A.   Financing of DMA

DMA's April 1998 business plan contemplated that DMA's initial capitalization would consist of $40 million.  DMA's July 1998 business plan projected that, with a total capitalization of $50 million, DMA would generate substantial revenues and profits during its first three years of operation.

Between April and July 1998, DWMC provided $20 million in equity funding to DMA in exchange for stock.  In November and December 1998, DWMC contributed an additional $30 million in equity funding to DMA in exchange for stock.  In November 1998, PPM Finance, Inc. ("PPM") agreed to extend DMA a $300 million line of credit (the "PPM Agreement").  In December 2000, at the request of PPM, and in order to ensure DMA's compliance with the PPM Agreement, DWMC converted to equity $60 million of debt owed by DMA to DWMC (for unpaid purchases of vehicles and

---

[1] As the parties are intimately familiar with the facts underlying this appeal, the Court will provide only a brief overview in this Introduction.

parts), raising DWMC's total equity investment in DMA to $110 million.

**B.   DMA's Purchases of Vehicles and Parts**

During the relevant time period, DMA purchased vehicles and parts from DWMC pursuant to a January 1, 1998 Automobile Purchase and Distribution Agreement, and a substantially identical November 18, 1999 Automobile Purchase and Distribution Agreement (collectively, the "Distribution Agreement").  Pursuant to the Distribution Agreement, each purchase order was documented by a document against acceptance agreement ("D/A"), which was executed by both parties and included, among other information, the items purchased, the purchase price, the payment due date (either 120 days or 180 days from the date of the "Bill of Lading" prepared for each purchase), and the applicable interest rate (generally LIBOR plus 6%).

As found by the bankruptcy court, the process by which DMA purchased vehicles and parts from DWMC can be broken down into three distinct time periods:  (1) November 1997 to November 1998 (the date of the first shipment of vehicles from DWMC to DMA through the date of the PPM Agreement); (2) November 1998 to November 2000 (the date of the PPM Agreement to the date of the commencement of DWMC's Korean reorganization proceedings); and (3) November 1998 to November 2000 (the date of the commencement of DWMC's Korean reorganization proceedings to the date of the last shipment of vehicles from DWMC to DMA).

During each time period, DMA purchased vehicles and parts from DWMC as follows:

**1.   November 1997 to November 1998**

During this time period, DMA was to pay for vehicles exclusively

through the above-described "D/A" method.   Thus, DMA was to pay 100% of the purchase price for each shipment of vehicles either 120 or 180 days from the Bill of Lading date.

### 2.   November 1998 to November 2000

During this time period, DMA was to pay for 70% of each shipment of vehicles "at sight" in cash, using the line of credit provided under the PPM Agreement.   The remaining 30% of each shipment was to be paid through the D/A method.

### 3.   November 1998 to November 2000

During this time period, DMA was to pay for the entire purchase price of each shipment "at sight" in cash, with 70% to be paid using line of credit provided under the PPM Agreement, and the remaining 30% to be paid by wire transfer.

### C.   Warranty and Free Maintenance Expenses

Under the Distribution Agreement and related "audit confirmation letters," DWMC agreed to reimburse DMA for certain warranty and free maintenance expenses incurred by U.S. Daewoo dealers.

### D.   DWMC's Reorganization Proceedings

On November 30, 2000, DWMC entered into reorganization proceedings in South Korea.   DWMC subsequently entered into negotiations with General Motors Corp. ("GM") regarding the purchase of DWMC's assets. In September 2001, DWMC and GM entered into a non-binding Memorandum of Understanding, which provided for the sale of certain assets, including DMA, to GM.   On April 30, 2002, however, GM and DWMC (and certain of DWMC's creditors) entered into a Master Transaction Agreement ("MTA"), pursuant to which GM purchased certain assets of DWMC, excluding DMA, and then transferred these assets to GM Daewoo Auto & Technology Co.

("GMDAT").  On September 30, 2002, the Korean court approved DWMC's Modified Reorganization Plan, which incorporated the terms of the MTA.

### E.   DMA's Bankruptcy Proceedings

DMA suffered substantial operating losses in each of its five years of operation (from 1998 to 2002).  On May 16, 2002 (the "Petition Date"), DMA filed a voluntary Chapter 11 petition for bankruptcy in the Central District of California.  Two aspects of these bankruptcy proceedings are relevant to the instant appeal.

#### 1.   The GM Litigation

On July 22, 2003, DMA filed a complaint in bankruptcy court against General Motors Corp. ("GM"); GM Daewoo Auto & Technology Co. ("GMDAT"), as the successor-in-interest to DWMC; Suzuki Motor Corp.; and American Suzuki Motor Corp., alleging claims for: (1) Fraud; (2) Tortious Interference With Contract; (3) Tortious Interference With Prospective Economic Advantage; (4) Aiding and Abetting Breach of Fiduciary Duty; (5) Violation of the Cartwright Act; (6) Unfair Competition; (7) Unjust Enrichment; (9) Fraudulent Transfer; and (10) Violation of the Automatic Stay.  The case was subsequently transferred to the United States District Court for the Middle District of Florida by the Multi District Litigation ("MDL") panel.

The district court granted defendants' motion to dismiss DMA's complaint, holding that all of DMA's claims were barred under the doctrine of international comity, because they constituted an impermissible collateral attack on the Korean court's approval of DWMC's Modified Reorganization Plan and, in particular, the Korean court's approval of the MTA.  Daewoo Motor America, Inc. v. General Motors Corp., 315 B.R. 148 (M.D. Fla. 2004).  The Eleventh Circuit

affirmed.  Daewoo Motor America, Inc. v. General Motors Corp., 459 F.3d 1249 (11th Cir. 2006).

### 2.    DMA's Adversary Proceeding Against DWMC

On November 18, 2002, DWMC timely filed a proof of claim in DMA's bankruptcy proceeding, seeking $122,729,359.79 for vehicles and parts shipped to DMA before the Petition Date, plus $36,227,129.00 in prejudgment interest.  On July 28, 2003, DMA filed on Objection to DWMC's Proof of Claim and Counterclaims against DWMC for: (1) Declaratory Relief; (2) Equitable Subordination; (3) Recovery of Setoff; (4) Breach of Contract; (5) Breach of Fiduciary Duty; (6) Violation of the Automatic Stay; and (7) Tortious Interference with Contract.

After extensive motion practice, the bankruptcy court conducted a four-day bench trial.  After DMA presented its case-in-chief, DWMC moved for judgment on partial findings pursuant to Federal Rule of Civil Procedure 52(c).  On July 6, 2010, the bankruptcy court entered judgment in favor of DWMC, finding that DWMC had a general unsecured claim in DMA's Chapter 11 case in the total amount (including prejudgment interest) of $118,131,046.99.

DMA timely appealed to this Court.

## II.   CLAIMS ON APPEAL

DMA raises eight issues in this appeal:

1.    Did the bankruptcy court err in refusing to recharacterize from debt to equity the amounts owed by DMA to DWMC for vehicles and parts?

2.    Did the bankruptcy court err in finding that DWMC did not breach the Distribution Agreement by failing to deliver

vehicles and parts to DMA?

3.  Did the bankruptcy court err in finding that DWMC did not breach the Distribution Agreement by failing to reimburse DMA for certain warranty and free maintenance expenses on the basis DWMC was entitled to "recoup" these expenses against the amounts that DMA owed DWMC for vehicles and parts under the Distribution Agreement?

4.  Did the bankruptcy court err in finding that the amount of unpaid warranty expenses as of the Petition Date was $22,708,265.36?

5.  Did the bankruptcy court err in finding that DWMC was not liable to DMA for consequential damages?

6.  Did the bankruptcy court err in refusing to award DMA prejudgment interest?

7.  Did the bankruptcy court err in awarding DWMC $33,962,113.53 in prejudgment interest?

8.  Did the bankruptcy court err in dismissing DMA's claim for equitable subordination?

The Court will address each of these issues in turn.

## III. DISCUSSION

### A. Recharacterization of Debt to Equity

The "D/A" agreements generated for each shipment of vehicles and parts from DWMC to DMA expressly provided that DMA would pay for the items being shipped. Nevertheless, DMA contends that the parties did not, in fact, intend that DMA would be liable for these unpaid "D/A receivables." Instead, DMA contends that these unpaid amounts constituted equity investments in DMA by DWMC. Accordingly, DMA argues

that these unpaid D/A receivables should be "recharacterized" from debt to equity for purposes of the distribution of DMA's estate.

### 1. The Bankruptcy Court's Authority to Recharacterize Debt to Equity

The recharacterization of debt to equity is a legal concept rooted primarily in tax law. See, e.g., A. R. Lantz Co. v. United States, 424 F.2d 1330, 1331 (9th Cir. 1970) ("This action deals with the oft-litigated tax issue of whether certain advances made to a corporation created debt, or constituted capital contributions."). No provision of the Bankruptcy Code expressly authorizes the recharacterization of debt to equity. Every Circuit Court of Appeal that has addressed this issue, however, has held that a bankruptcy court may properly order the recharacterization of debt to equity under the broad authority afforded by 11 U.S.C. § 105(a).[2]

> In our view, recharacterization is well within the broad powers afforded a bankruptcy court in § 105(a) and facilitates the application of the priority scheme laid out in § 726. The Code establishes a system in which contributions to capital receive a lower priority than loans because the essential nature of a capital interest is a fund contributed to meet the obligations of a business and which is to be repaid only after all other obligations have been satisfied. Thus, implementation of the Code's priority scheme requires a determination of whether a particular obligation is debt or equity. Where, as here, the question is in dispute, the bankruptcy court must have the authority to make this determination in order to preserve the Code's priority scheme.
> . . . .
> In holding that the recharacterization power is integral to

---

[2] "The [bankruptcy] court may issue any order, process, or judgment that is necessary or appropriate to carry out the provisions of this title. No provision of this title providing for the raising of an issue by a party in interest shall be construed to preclude the court from, sua sponte, taking any action or making any determination necessary or appropriate to enforce or implement court orders or rules, or to prevent an abuse of process." 11 U.S.C. § 105(a).

the consistent application of the Bankruptcy Code, we join every other circuit that has considered the question.

In re Dornier Aviation, Inc., 453 F.3d 225, 231, 233 (4th Cir. 2006) (citing In re SubMicron Sys. Corp., 432 F.3d 448(3d Cir. 2006); In re Hedged-Investments Assocs., 380 F.3d 1292 (10th Cir. 2004); In re AutoStyle Plastics, Inc., 269 F.3d 726 (6th Cir. 2001)) (internal citations and quotation marks omitted)).

The Ninth Circuit has never addressed whether bankruptcy courts have the authority to recharacterize debt to equity.  The Ninth Circuit Bankruptcy Appellate Panel, however, has held that bankruptcy courts lack such authority.  See In re Pacific Express, Inc., 69 B.R. 112, 115 (B.A.P. 9th Cir. 1986).

> While the [Bankruptcy] Code supports the court's ability to determine the amount and the allowance or disallowance of claims, those provisions do not provide for the characterization of claims as equity or debt.  The result achieved by such a determination, i.e. subordination, is governed by 11 U.S.C. Section 510(c).  Where there is a specific provision governing these determinations, it is inconsistent with the interpretation of the Bankruptcy Code to allow such determinations to be made under different standards through the use of the court's equitable powers.

Id. at 115.

The B.A.P. ruling in In re Pacific Express is not binding on this Court.  See Bank of Maui v. Estate Analysis, 904 F.2d 470, 472 (9th Cir. 1990) ("BAP decisions cannot bind the district courts themselves. As article III courts, the district courts must always be free to decline to follow BAP decisions and to formulate their own rules within their jurisdiction.").  Moreover, the In re Pacific Express decision has been roundly criticized by other courts.  As noted above, every Circuit court to address this issue has declined to follow it.  See Sharp v. Hawkins (In re The 3DO Co.), 2004 Bankr. LEXIS 2345, at *13

(Bankr. N.D. Cal. July 2, 2004) ("[T]his court will not follow *Pacific Express* for the reasons set forth in many cases and commentaries criticizing that decision.") (collecting cases); but see Straightshot Communs. Inc. v. Telekenex, Inc., 2010 U.S. Dist. LEXIS 123390, at *2 (W.D. Wash. Nov. 19, 2010) ("In the Ninth Circuit . . . bankruptcy courts do not have the power to adjudicate a claim for debt recharacterization.") (citing In re Pacific Express, 69 B.R. at 115, without discussion of the binding effect of B.A.P. decisions on district courts).

Accordingly, this Court declines to follow In re Pacific Express, and will review the bankruptcy court's denial of DMA's recharacterization claim on the merits.

### 2.   Standard of Review

#### (a)   Applicable Standard of Review

> [T]he question of whether an advance to a corporation is debt or equity is "primarily directed at ascertaining the intent of the parties." *A. R. Lantz Co. v. United States*, 424 F.2d 1330, 1333 (9th Cir. 1970). . . . [T]his determination is a question of fact, "which, when once resolved by the district court, cannot be overturned unless clearly erroneous." *Id.* at 1334.

Bauer v. Commissioner, 748 F.2d 1365, 1367 (9th Cir. 1984) (quoting A. R. Lantz Co. v. United States, 424 F.2d 1330, 1333 (9th Cir. 1970)).

DMA argues that the above-quoted legal standard was impliedly overruled by the Ninth Circuit's *en banc* decisions in United States v. McConney, 728 F.2d 1195 (9th Cir. 1984) (holding that whether federal agents' failure to comply with the "knock-notice" requirement of 18 U.S.C. § 3109 was excused by "exigent circumstances" was a "mixed question of law and fact" and, therefore, subject to *de novo* review), and In re Bammer, 131 F.3d 788 (9th Cir. 1997) (en banc) (holding that

whether a person had "just" cause to harm another's interests was a mixed question of law and fact, subject to *de novo* review).  This Court cannot accept DMA's argument for several reasons.

First, the Ninth Circuit expressly rejected this very argument in <u>A. R. Lantz Co. v. United States</u>, 424 F.2d 1330 (9th Cir. 1970), holding that the recharacterization of debt to equity is **not** a mixed question of law and fact; it is instead a question of fact, which must be reviewed for clear error.  <u>Id.</u> at 1332-33 (rejecting taxpayer's argument that the recharacterization analysis involved a "mixed question of law and fact.").

Second, while many of the historical facts in this case are undisputed, a number of material facts (including the ultimate factual issue – the intent of the parties at the time of the relevant transactions) are **not** undisputed.  In denying summary judgment on the issue of recharacterization, for example, the bankruptcy court noted "just out of the box, this seems like a uniquely bad theory to seek summary adjudication on because it's so intensely factual." (5 ER 1080-81).  "[T]his just seems to me to be bursting with factual issues." (5 ER 1082; <u>see also</u> Opening Brief at 42, n.22 (DMA arguing in this appeal that the bankruptcy court's factual finding that DMA paid for 93.9% of the vehicles and parts it purchased from DWMC was erroneous)).  The bankruptcy court conducted a four-day bench trial, which entailed live testimony from five DMA witnesses and the review of 16 sworn declarations.  The bankruptcy court's decision rested directly upon (among other things) its evaluation of this testimony.  (<u>See, e.g.</u>, 1 ER 23, Judgment, at ¶ 52 (finding, in light of conflicting evidence in the record, that testimony of DMA's expert witness Leonard

Lyons regarding DMA's documentation of the transactions at issue was "not accurate or credible.")).  "Deference to the bankruptcy court's findings is particularly appropriate when, as here, the bankruptcy court presided over a bench trial in which witnesses testified and the court made credibility determinations."  In re Dornier Aviation, 453 F.3d at 235.

Third, the en banc decisions cited by DMA are not inconsistent with the Ninth Circuit's prior holding in both Bauer and A. R. Lantz Co. that recharacterization is an inherently factual inquiry, which must be reviewed under the clear error standard.  Both of these en banc decisions continued to recognize the long-standing principle that:

> If application of the rule of law to the facts requires an inquiry that is "essentially factual" – one that is founded "on the application of the fact-finding tribunal's experience with the mainsprings of human conduct" – the concerns of judicial administration will favor the district court, and the district court's determination should be classified as one of fact reviewable under the clearly erroneous standard.

McConney, 728 F.2d at 1202 (quoting Pullman-Standard, Div. of Pullman v. Swint, 456 U.S. 273 (1982); Commissioner v. Duberstein, 363 U.S. 278, 289 (1960)) (internal citations omitted).

> There are . . . some types of mixed questions that are exceptions to this general predominance of factors favoring de novo review.  First, there are those mixed questions in which the applicable legal standard provides for a strictly factual test, such as state of mind, and the application of law to fact, consequently, involves an "essentially factual" inquiry.

McConney, 728 F.2d at 1203 (quoting Pullman-Standard, 456 U.S. at 288).

In both Bauer and A. R. Lantz Co., the Ninth Circuit concluded that the question of debt recharacterization involves precisely this type of "essentially factual" inquiry.  See Bauer, 748 F.2d at 1367 ("[T]he question of whether an advance to a corporation is debt or

equity is "primarily directed at ascertaining the intent of the parties." . . . . [T]his determination is a question of fact, "which, when once resolved by the district court, cannot be overturned unless clearly erroneous.") (quoting A. R. Lantz Co. v. United States, 424 F.2d 1330, 1333 (9th Cir. 1970)). Numerous courts have recognized the inherently factual nature of the debt recharacterization inquiry. See, e.g., Hardman v. United States, 827 F.2d 1409, 1413 (9th Cir. 1987) ("[T]he purpose of this entire inquiry is to decipher the true intent of the parties."); In re SubMicron Sys. Corp., 432 F.3d 448, 457 (3d Cir. 2006) ("[T]he determinative inquiry in classifying advances as debt or equity is the intent of the parties as it existed at the time of the transaction. So framed, we agree with our Sixth and Ninth Circuit colleagues that this is a question of fact that, once resolved by a district court, cannot be overturned unless clearly erroneous.") (internal quotations and citations omitted). Accordingly, the proper standard of review is clear error.[3]

### (b)   Clear Error Standard

As articulated by the Supreme Court:

> [A] finding is 'clearly erroneous' when although there is evidence to support it, the reviewing court on the entire evidence is left with the definite and firm conviction that a mistake has been committed. This standard plainly does not entitle a reviewing court to reverse the finding of the trier of fact simply because it is convinced that it would have decided the case differently. The reviewing court oversteps the bounds of its duty under Rule 52(a) if it undertakes to duplicate the role of the lower court. In applying the clearly erroneous standard to the findings of a district court sitting without a jury, appellate courts must constantly have in mind that their function is not to decide

---

[3] The Court further notes that it would affirm the bankruptcy court's well-reasoned decision even if the standard of review were de novo. This is not a close issue.

factual issues de novo.  If the district court's account of the evidence is plausible in light of the record viewed in its entirety, the court of appeals may not reverse it even though convinced that had it been sitting as the trier of fact, it would have weighed the evidence differently.  Where there are two permissible views of the evidence, the factfinder's choice between them cannot be clearly erroneous.

Anderson, 470 U.S. at 572 (internal citations and quotation marks omitted).

### 3.   Burden of Proof

At trial, DMA had the burden of proof on the issue of recharacterization.  See Vieira v. AGM II, LLC (In re Worldwide Wholesale Lumber, Inc.), 378 B.R. 120, 124 (Bankr. D.S.C. 2007) ("The party seeking to reclassify a debt as an equity contribution needs to demonstrate that the intent of the parties at the time they entered into the transaction was to enter into an investment relationship, not a lending relationship.").

### 4.   Waiver

Throughout this litigation, DMA has taken inconsistent positions as to precisely what debt it believes should be recharacterized as equity.  As noted by the bankruptcy court:

> DMA . . . has not been consistent as to which portion of its obligations it contends should be recharacterized as equity. At the hearing on the motions in limine in this matter, DMA stated that the approximately $122 million in invoices for vehicles and parts that remained unpaid at the time of DMA's bankruptcy (which included invoices from all three purchase time periods) was the equity portion.  At trial, DMA took the position that the equity portion was the $211 million worth of vehicles and parts shipped before the PPM financing began, less $30 million that DMA paid to DWMC in December 1998, less $60 million that was converted from debt to equity in December 2000.

(1 ER 17, Judgment at ¶ 46).

On appeal, DMA has changed its recharacterization theory once again.  DMA now contends that $115.8 million of unpaid D/A receivables

(*i.e.*, the $122.7 million in unpaid invoices at the time of DMA's bankruptcy, less $6.9 million in non-D/A receivables) should be recharacterized as equity.

DWMC argues that DMA waived this "partial recharacterization" theory by failing to raise it at trial. The Court disagrees. By arguing that the full $122.7 million in unpaid invoices should be recharacterized, DMA sufficiently presented its current claim – that some, but not all, of these unpaid invoices should be recharacterized – to the bankruptcy court. By finding that the $122.7 million in unpaid invoices at the time of DMA's bankruptcy should not be recharacterized, the bankruptcy court necessarily found that the portion of these invoices comprised of D/A receivables (*i.e.*, $115.8 million) should not be recharacterized either.

Accordingly, DMA may properly argue its partial recharacterization theory on appeal. See generally Lebron v. Nat'l R.R. Passenger Corp., 513 U.S. 374, 379 (1995) ("Our traditional rule is that once a federal claim is properly presented, a party can make any argument in support of that claim; parties are not limited to the precise arguments they made below.") (internal alterations and quotation marks omitted).

### 5.    Legal Framework for Recharacterization

> In defining the recharacterization inquiry, courts have
> adopted a variety of multi-factor tests borrowed from non-
> bankruptcy caselaw. While these tests undoubtedly include
> pertinent factors, they devolve to an overarching inquiry:
> the characterization as debt or equity is a court's attempt
> to discern whether the parties called an instrument one thing
> when in fact they intended it as something else. That intent
> may be inferred from what the parties say in their contracts,
> from what they do through their actions, and from the
> economic reality of the surrounding circumstances. Answers
> lie in facts that confer context case-by-case.

In re SubMicron Sys. Corp., 432 F.3d 448, 455-56 (3d Cir. 2006); accord

Bauer, 748 F.2d at 1367 (holding the court's focus is "primarily directed at ascertaining the intent of the parties") (quoting A.R. Lantz, 424 F.2d at 1333)). More precisely, the recharacterization inquiry is directed at ascertaining the parties' intent *at the time of the relevant transactions*. See Bayer Corp. v. MascoTech, Inc. (In re Autostyle Plastics, Inc.), 269 F.3d 726, 747-48 (6th Cir. 2001) ("Recharacterization is appropriate where the circumstances show that a debt transaction was 'actually [an] equity contribution [] *ab initio*.'") (quoting In re Cold Harbor Assocs., 204 B.R. 904, 915 (Bankr. E.D. Va. 1997)).

At trial, DMA argued that the bankruptcy court should apply the eleven-factor recharacterization test enunciated by the Sixth Circuit in In re AutoStyle Plastics, Inc., 269 F.3d 726 (6th Cir. 2001). (See 16 ER 4233-50 (DMA Trial Brief)). On appeal, DMA has inexplicably changed its approach, relying instead on the (slightly different) set of factors utilized by the Ninth Circuit in the context of tax cases. (See Opening Brief at 34-35 (quoting Hardman v. United States, 827 F.2d 1409, 1411-12 (9th Cir. 1987)). DMA does not argue that the bankruptcy court erred in relying on the AutoStyle factors - nor could it, given DMA's express argument to the bankruptcy court that it *should* rely on AutoStyle.

As a practical matter, the Hardman and AutoStyle factors are largely interchangeable, and both sets of factors serve as functional tools to resolve the same overarching inquiry - what was the intent of the parties at the time of the relevant transactions. As noted by DMA, the application of one set of factors versus the other will not materially affect the Court's analysis. (See Opening Brief, at 35

("The approach the Ninth Circuit takes to recharacterization in taxation cases is, for all intents and purposes, the same as the approach that other circuits take to recharacterization in both taxation and bankruptcy cases.  Essentially the same list of factors is used by all he courts.")).  Because the bankruptcy court (at DMA's urging) relied on the AutoStyle factors, however, this Court will review the bankruptcy court's decision under the AutoStyle framework.[4]

Under AutoStyle, bankruptcy courts look to the following eleven factors to determine whether recharacterization is warranted:

(1)   the names given to the instruments, if any, evidencing the indebtedness;

(2)   the presence or absence of a fixed maturity date and schedule of payments;

(3)   the presence or absence of a fixed rate of interest and interest payments;

(4)   the source of repayments;

(5)   the adequacy or inadequacy of capitalization;

(6)   the identity of interest between the creditor and the stockholder;

(7)   the security, if any, for the advances;

(8)   the corporation's ability to obtain financing from outside lending institutions;

(9)   the extent to which the advances were subordinated to the

---

[4]

To the extent that the application of the Hardman factors arguably could be more favorable to DMA's position on appeal, DMA waived its ability to rely on these factors by failing to advance them – and instead expressly arguing for the application of the AutoStyle factors – below.

claims of outside creditors;

    (10)  the extent to which the advances were used to acquire capital assets;

    (11)  the presence or absence of a sinking fund to provide repayments.

In re AutoStyle Plastics, Inc., 269 F.3d at 749-50; accord 4 Collier on Bankruptcy, ¶ 510.02[3] (16th ed. 2009) (listing the same eleven factors).  As noted above, "No one factor is controlling or decisive. The factors must be considered within the particular circumstances of each case."  In re AutoStyle Plastics, Inc., 269 F.3d at 750 (internal citation omitted).

### 6.   Recharacterization Distinguished From Equitable Subordination

As discussed above, DMA's recharacterization claim rests upon the intent of the parties at the time of the underlying transactions.  If the parties intended that the amounts owed by DMA to DWMC be treated as debt, DMA's claim for recharacterization fails.  Notably, the recharacterization analysis does *not* entail a determination of whether treating the transactions as debt is fair or equitable.  Such analysis is proper only in the context of a claim for equitable subordination under 11 U.S.C. Section 510(c).

> [E]quitable subordination . . . differs markedly and serves different purposes from recharacterization.  While a bankruptcy court's recharacterization decision rests on the *substance of the transaction* giving rise to the claimant's demand, its equitable subordination decision rests on its assessment of the *creditor's behavior*. . . .  [W]hen a claim is equitably subordinated . . . the courts seek to remedy some inequity or unfairness perpetrated against the bankrupt entity's other creditors or investors by postponing the subordinated creditor's right to repayment until others' claims have been satisfied. . . .  Thus, although recharacterization and equitable subordination lead to a

similar result, they "address distinct concerns" and require a bankruptcy court to conduct different inquiries. *See Cohen v. KB Mezzanine Fund II, LP (In re SubMicron Sys. Corp.)*, 432 F.3d 448, 454 (3d Cir. 2006).

*In re Dornier Aviation (N. Am.), Inc.*, 453 F.3d at 232.

Accordingly, to the extent DMA argues that treating the amounts that it owes to DWMC as debt instead of equity is somehow *unfair*, the court may not properly consider such arguments in the context of DMA's recharacterization claim.

       7.    **Analysis**

          (a)    **Insider Status and Undercapitalization are**

                   **Insufficient to Support Recharacterization**

DMA purports to argue that each and every AutoStyle factor supports the recharacterization of debt to equity in this case. In reality, however, DMA's arguments essentially boil down to two factors that allegedly support recharacterization: (1) DWMC's "insider status" as the corporate parent of DMA, which was a wholly-owned subsidiary of DWMC; and (2) DMA's alleged undercapitalization. As noted by the Fourth Circuit, however:

> We think it important to note that a claimant's insider status and a debtor's undercapitalization alone will normally be insufficient to support the recharacterization of a claim. In many cases, an insider will be the only party willing to make a loan to a struggling business, and recharacterization should not be used to discourage good-faith loans.

*Fairchild Dornier GmbH v. Official Comm. of Unsecured Creditors (In re Dornier Aviation (N. Am.), Inc.)*, 453 F.3d 225, 234 (4th Cir. 2006).

> Often an insider is the only source of funds for a struggling company. If the insider creditor faces a possibility of its claim being recharacterized and subordinated even without any inequitable conduct, it will think twice before lending money to a debtor possibly nearing bankruptcy. This would make it nearly impossible for companies such as [DMA] to borrow money when they need it the most.

Matthew Nozemack, <u>Note: Making Sense Out of Bankruptcy Court's Recharacterization of Claims:  Why Not Use § 510(c) Equitable Subordination?</u>, 56 Wash & Lee L. Rev. 689, 715 (Spring 1999).

### (b)   Sale of Inventory

The majority of recharacterization cases cited by the parties involve one or more advances of funds from a creditor to a debtor. Thus, the analysis in these cases focuses primarily on determining whether the advance at issue more closely resembles a typical loan transaction or a stock purchase.

Here, in contrast, the relevant transactions were not advances of *funds* from DWMC to DMA – neither party disputes that the initial $50 million in cash that DWMC advanced to DMA constituted an equity investment.  Instead, the relevant transactions all involve the *sale and purchase of goods*:  DWMC sold DMA vehicles and parts, and allowed DMA to purchase these items, in part, on credit.  Thus, the relevant inquiry in this case is (in part) whether these transactions more closely resemble *bona fide* sales/purchase transactions - including the extension of trade credit to DMA - or equity investments.

This is not to say that a transfer of goods cannot be recharacterized from debt to equity.  <u>See In re Dornier Aviation</u>, 453 F.3d 225, 234 (4th Cir. 2006) (holding the transfer of inventory can, under certain circumstances, constitute an equity investment, reasoning "[i]f we were to adopt [creditor's] position, that would simply invite equity investors to structure their capital contributions as 'sales of inventory' thereby undermining the purposes of recharacterization."). Nevertheless, in evaluating  DMA's recharacterization claim, the Court must take into account the fundamental economic differences between a

loan and a sales transaction.  See Hardman, 827 F.2d at 1411 ("Courts closely scrutinize the economic reality of such transactions to determine whether the taxpayer's characterization is genuine or whether the transaction was, as the IRS contends here, a sale in name only.").

For example, in order for a standard loan transaction to be profitable, the creditor must not only collect 100% of the principal amount, but must also charge interest.  Accordingly, several of the AutoStyle factors focus on the *bona fide* nature of the creditor's attempts to collect interest payments from the debtor.  Selling cars, however, is fundamentally different.  A manufacturer need not charge *any* interest in order to make a profit on the sale of a car.  Instead, the manufacturer's profitability is determined by its profit margin; *i.e.*, the difference between the cost of manufacturing the car[5] and its sales price.

Thus, while one would expect a manufacturer to charge some form of interest when extending trade credit to its customers, the bankruptcy court did not clearly err in discounting the relative importance of DMA's efforts to collect such interest in this case, given the "economic reality" of the transactions at issue.  As correctly stated by the bankruptcy court, "in determining the true intended substance of the transaction, the Court looks to the economic realities of the transaction at the time it was made[.]"  (1 ER 21, ¶ 49).

### (c)  Names Given to the Instruments (Factor 1)

The bankruptcy court did not clearly err in finding that "the documents supporting each and every shipment of vehicles and parts

---

[5]
Including related expenses for distribution, marketing, sales, overhead, interest, etc.

evidence the parties' intent to engage in a purchase and sale, not an equity contribution." (See 1 ER 22, Judgment, at ¶ 52). Voluminous evidence supports this finding. Nor did the bankruptcy court clearly err in finding DMA's expert's testimony that "[t]here are no documents memorializing the alleged loan between DMA and DWMC" was neither accurate nor credible. (See 1 ER 23, Judgment, at ¶ 52).

Accordingly, the bankruptcy court did not clearly err in finding that this factor weighs strongly against recharacterization.

### (d)   Additional Evidence of the Parties' Intent[6]

The bankruptcy court did not clearly err in finding that the parties' course of conduct demonstrated that they intended to treat the unpaid D/A receivables as debt, not equity. "In every way, and at every opportunity, DMA treated the amounts owed to DWMC as debt that it was obligated to repay." (1 ER 24, Judgment at ¶ 56). Among other evidence, the bankruptcy properly relied on the following findings, none of which were clearly erroneous:

- "DWMC routinely and repeatedly demanded that DMA pay unpaid invoices for vehicles and parts. In addition to written letters, DWMC also made telephone calls requesting that DMA pay for the vehicles." (1 ER 9, Judgment at ¶ 18 (internal citations omitted)).

- "In response to these demands, DMA requested several extensions of time within which to make its payments for

---

[6] The Ninth Circuit's eleven-factor recharacterization test in the tax context includes a separate factor for the objective "intent of the parties." See Hardman, 827 F.2d at 1413. While the AutoStyle framework does not include a separate "intent" factor, the overarching purpose of the inquiry is to determine the intent of the parties at the time of the relevant transactions.

vehicles and parts. On at least a few occasions, DWMC agreed to these requests and did so in exchange for DMA's agreement to pay 'extension interest.'" (Id.).

- DMA's audited financial statements consistently characterized the amounts DMA owed to DWMC as accounts payable, i.e., debt. (1 ER 9-11, Judgment at ¶¶ 19-22).

- Similarly, "audit confirmation letters" executed by DMA and DWMC treated the amounts DMA owed to DWMC as debt. (1 ER 11, Judgment at ¶¶ 23-36).

- In connection with DWMC's Korean reorganization proceedings, DWMC sent a letter to DMA on January 10, 2001, requesting that it confirm the amount DMA owed to DWMC as of November 30, 2000. (1 ER 12, Judgment at ¶ 27). DMA's Chief Financial Officer confirmed that DMA owed DWMC the following amounts, which he handwrote on the confirmation request:

    $176,387,425.76     (D/A portion)
    $14,257,577.00      (L/C portion)
    $190,645,002.76     (Total)

  (1 ER 12, Judgment at ¶ 28). DMA's president then signed this confirmation request and sent it to DWMC (and DWMC's auditors). (1 ER 12-13, Judgment at ¶¶ 28-29). The bankruptcy did not clearly err in finding this admission to be "significant," nor did it clearly err in discounting witness testimony that contradicted this prior acknowledgment of debt by DMA. (See 1 ER 25, Judgment at ¶ 58).

- In December 2000, at the request of PPM, and in order to ensure DMA's compliance with the PPM Agreement, DWMC

converted to equity $60 million of debt owed by DMA to DWMC under the Distribution Agreement. (1 ER 13, Judgment at ¶ 30). Obviously, had the amounts that DMA owed to DWMC been equity investments *ab initio*, this conversion would have been entirely unnecessary. Moreover, DMA's president testified that he "continuously requested additional debt to equity conversions, but no additional debt to equity conversions were implemented." (1 ER 13, Judgment at ¶ 30). DMA's president further testified that he understood that the vehicles and parts DMA purchased from DWMC "do[] not get . . . converted into equity until it becomes necessary and [DWMC] decides to do so." (1 ER 25, Judgment at ¶ 57).

- DMA's president and CFO both testified that the amounts DMA owed to DWMC for vehicles and parts were "trade accounts payable in the ordinary course of business." (1 ER 14, Judgment at ¶ 33). To the extent that DMA had sufficient funds, DMA's president always intended to pay down DMA's debt to DWMC. (1 ER 14, Judgment at ¶ 31). No one at either DMA or DWMC ever said that DMA would not have to pay for any portion of the vehicles and parts purchased from DWMC, because they were actually equity contributions. (1 ER 14, Judgment at ¶ 32).

- In arguing for summary judgment, DMA's attorneys conceded that DMA fully expected it would have to pay the amounts that it owed to DWMC. "DMA is <u>not</u> taking the position that it was not required to pay – to the contrary, the evidence confirm[s] that DMA attempted to pay off all of its a/p owing

to [DWMC]." (18 ER 4758 (DMA Reply I/S/O Motion for Partial Summary Judgment)).

Accordingly, the bankruptcy court did not clearly err in finding that the parties' course of conduct weighs strongly against recharacterization.

### (e) Fixed Maturity Date and Schedule of Payments (Factor 2) & Fixed Rate of Interest and Interest Payments (Factor 3)

The presence of both a fixed maturity date and a fixed rate of interest weighs against recharacterization. Here, the document against acceptance ("D/A") agreements at issue set forth, among other things, the purchase price, the applicable rate of interest (generally LIBOR plus 6%), and the payment due date (*i.e.*, maturity date) for each of the relevant transactions. (1 ER 7, Judgment at ¶ 11). As noted by the bankruptcy court, "[i]nterest during the period of the D/A was built into each invoice and was to be paid by DMA as part of the purchase price." (1 ER 23, Judgment at ¶ 53). The bankruptcy court further found that "[i]f DMA requested extensions of time within which to pay these invoices, DWMC often granted those requests on the condition that DMA agree to pay extension interest." (1 ER 23, Judgment at ¶ 53).

Accordingly, the bankruptcy court did not clearly err in finding that these factors weigh strongly against recharacterization.

That DWMC ultimately failed to collect any "extension interest" from DMA does not undermine the bankruptcy court's finding. Instead, DWMC's forbearance with respect to such interest appears to have been nothing more than a practical recognition of the economic reality

facing the parties at the time - DMA was struggling to pay its bills,

let alone *interest* on its bills.

> Debtor's argument seems to be that a creditor's agreement to
> forbear until Debtor is in position to pay will result in
> recharacterization of secured or unsecured debt to equity.
> It can hardly be argued that forbearance in the face of
> financial stress by itself supports a finding of
> recharacterization.  Forbearance until a debtor's cash flow
> improves may be good judgment to keep a loan out of
> bankruptcy court, and that is all to be concluded from [the
> creditor]'s forbearance for a time in connection with
> [Debtor]'s debt. . . .  If such forbearance could
> retroactively convert a good loan to equity, that would
> indeed validate the saying that "no good deed goes unpunished."

Drake v. Franklin Equip. Co. (In re Franklin Equip. Co.), 418 B.R. 176,

195-96 (Bankr. E.D. Va. 2009) (quoting Repository Techs., Inc. v.

Nelson (In re Repository Techs., Inc.), 363 B.R. 868, 883 (Bankr. N.D.

Ill. 2007)).

Moreover, as noted above, DWMC's incentive to collect interest in

this case was mitigated by the fact that DWMC was not acting as a pure

lender; it was instead acting as a manufacturer and seller of goods.

### (e)   Source of Repayments (Factor 4)

"If the expectation of repayment depends solely on the success of

the borrower's business, the transaction has the appearance of a

capital contribution."  In re Autostyle Plastics, Inc., 269 F.3d at

751.  "If repayment is not dependent upon earnings, the transaction

more resembles a sale."  Hardman, 827 F.2d at 1413.

Here, the bankruptcy court did not clearly err in finding that

DMA's obligation to pay DWMC was *not* dependent on the success of DMA's

business.  DMA never turned a profit and never issued a dividend.

(1 ER 9, Judgment at ¶ 17).  Nevertheless, from 1997 to 2001, DMA paid

DWMC a total of $1.597 billion (including offsets and conversion by

DWMC of some of the accounts payable to equity), equal to 93.9% of the

1  total invoices from DWMC over that five-year period.[7]  (Id.).

2  Cf. Geftman v. Comm'r, 154 F.3d 61, 71 (3d Cir. 1998) (holding

3  "repayments which are insubstantial in relation to the amount

4  transferred are not indicative of a bona fide debt" and, therefore, "a

5  repayment of only 3% of the total amount transferred[] cannot be

6  regarded as evidence of a bona fide obligation to repay the principal

7  amount").

8       On appeal, DMA attempts to artificially isolate the D/A portion of

9  each sales transaction from the remaining portion of the transaction

10  (including, e.g., the portion of each sale for which DMA paid upfront).

11  (See Reply, at 21 (arguing that "[t]he percentage of total cost [DMA]

12  paid [i.e., 93.9%] is not the issue.  The percentage of D/A receivables

13  is.")).  This argument impermissibly ignores the "economic reality" of

14  the underlying sales transactions.  See Hardman, 827 F.2d at 1411

15  (holding the court must consider "the context of the overall

16  transaction").

17       DMA further misconstrues the use of the term "earnings" in the

18  case law evaluating this factor.  Under DMA's interpretation, any

19  obligation that is to be paid out of a company's revenues should be

20

21  [7]

22  In a footnote, DMA contends it actually paid for only 84.71% of the
   vehicles and parts that it purchased from DWMC during this time period,

23  not 93.9% as the bankruptcy court found.  (Opening Brief, at 42, n.22).
   This contention is, of course, directly contrary to DMA's subsequent

24  assertion that "[DMA] has not challenged any finding of historical fact
   regarding recharacterization."  (Reply, at 1).  In any event, DMA's

25  thinly-supported assertion that it actually paid for 84.71% of its
   purchases - buried in a footnote in a 120-page brief, with no

26  substantive argument - is insufficient to demonstrate that the
   bankruptcy court's finding was clearly erroneous.  Moreover, whether

27  DMA paid for 84.71% or 93.9% of the relevant purchases, the undisputed
   fact remains that DMA paid for the vast majority of its purchases from

28  DWMC despite never turning a profit.

construed as equity rather than debt.  This contention is incorrect –
virtually *every* obligation of a corporation must ultimately be paid
(either directly or indirectly) out of its revenues.  The relevant
inquiry is whether a given obligation is to be paid only out of the
debtor's *profits*, a circumstance which courts have recognized is
indicative of an equity investment.  See, e.g., Hardman, 827 F.2d at
1413 (noting that "[o]n its face, this factor seems to weigh in favor
of a finding of equity because the payment came from corporate
profits," but ultimately holding that this factor weighed in favor of a
finding of debt because the contract provided for payment "even if the
company suffered a loss in its overall operations").

Accordingly, the bankruptcy court did not clearly err in finding
that this factor weighs against recharacterization.

### (f)  Adequacy of Capitalization (Factor 5)

If the company receiving the funds in question was
undercapitalized, such undercapitalization generally weighs in favor of
recharacterization.  This factor is given less weight, however, in the
bankruptcy context.  "Courts should not put too much emphasis on this
factor, in any event, because all companies in bankruptcy are in some
sense undercapitalized."  Official Comm. of Unsecured Creditors v. Bay
Harbour Master Ltd. (In re BH S&B Holdings LLC), 420 B.R. 112, 159
(Bankr. S.D.N.Y. 2009) (citing In re Lifschultz Fast Freight, 132 F.3d
339, 345 (7th Cir. 1997) ("Every firm in bankruptcy, and many outside,
can in some sense be said to be undercapitalized.")).  Indeed, a recent
law review article persuasively opined that the mechanical application
of this factor (which was developed in the tax arena) often leads to
the wrong result in the bankruptcy context.

In a bankruptcy case, application of standards from tax cases involving solvent corporations can result in an Alice in Wonderland effect such that the worse the debtor corporation's financial situation and the riskier the insider's loan, the more the application of the factors weighs in favor of deeming the creditor as having intended the loan to be a capital contribution. For example, the *Roth Steel* factors consider "adequacy or inadequacy of capitalization" at the time of an advance as a factor that bears on whether an advance is intended as debt or as an equity contribution. If a corporation is solvent but thinly capitalized, this factor may have some bearing on the investor's expectation as to the timing of repayment and the investor's choice between acquiring debt or equity. **But if a corporation is insolvent, no rational investor would choose to buy equity that is "out of the money" and most likely worthless. At the very least, one would think that insolvency should be viewed as evidence supporting an investor's assertion that it was legitimately concerned about repayment of its advance and intended that the advance would be treated as debt.** Nevertheless, bankruptcy cases continue to apply this factor as if insolvency is somehow evidence that an investor that has advanced funds nominally as debt must have intended to make an equity contribution.

James M. Wilton & Stephen Moeller-Sally, <u>Debt Recharacterization Under State Law</u>, 62 Bus. Law. 1257, 1265-66 (2007) (emphasis added).

Moreover, to the extent that it is arguably *unfair* for an insider to advance funds to an undercapitalized debtor as debt rather than equity, any such unfairness should be analyzed in the context of a claim for equitable subordination under 11 U.S.C. Section 510(c); it is not relevant to the recharacterization inquiry. <u>See In re Dornier Aviation (N. Am.), Inc.</u>, 453 F.3d at 232.

Here, the bankruptcy court found: "The most DMA has been able to demonstrate is that, although DWMC put a substantial amount of equity into DMA, it was probably not sufficient, and that DMA . . . could not afford to pay for all of the vehicles and parts it purchased from DWMC. But that is not enough to support recharacterization." (1 ER 25, Judgment at ¶ 59). The bankruptcy court based this conclusion on its finding that, *at the time of the relevant transactions,* the parties

believed that DMA was, in fact, adequately capitalized.  This finding
is not clearly erroneous, and is supported by the following evidence:

- DMA's April 1998 business plan assumed that DMA's initial
  capitalization would consist of $40 million.  DMA's July 1998
  business plan projected that, with a total capitalization of
  $50 million, DMA would generate substantial revenues and
  profits during the first three years of operations.
  (1 ER 15, Judgment at ¶ 35; 12 ER 3153).  By December 1998,
  DWMC had made a total equity investment in DMA of $50
  million.  (1 ER 15, Judgment at ¶¶ 35-36).

- DMA admitted that the financial information in its April 1998
  and July 1998 business plans was prepared in good faith,
  based on assumptions that DMA believed were reasonable at the
  time.  (1 ER 12, Judgment at ¶ 35).

- In order to obtain financing from PPM in November 1998, DMA
  executed a Solvency Certificate stating that "it ha[d]
  capital sufficient to carry on its business as then
  constituted."  (1 ER 15, Judgment at ¶ 36).

- From January 1999 through November 2001, DMA's president
  repeatedly stated to DMA employees, dealers, and the public
  that DMA was adequately capitalized.  (1 ER 15-16, Judgment
  at ¶ 37).

Moreover, the bankruptcy court did not clearly err in discounting
the testimony of DMA's experts, each of whom testified that DMA was, in
fact, undercapitalized.  Both experts conceded that their analyses were
based on the actual financial results of DMA (and other companies),
which were not available when DWMC was deciding how to capitalize DMA.

(1 ER 16, Judgment at ¶ 38).  The bankruptcy court properly found that such "Monday-morning quarterbacking" is of little probative value in this case, where the court's inquiry rests upon the intent of the parties at the time of the relevant transactions.

In a well-reasoned decision, the court in American Processing & Sales Co. v. United States, 371 F.2d 842 (Ct. Cl. 1967), explained that while the success of any start-up venture is uncertain – and may entail significant losses – this uncertainty does not necessarily render it unreasonable for a creditor to advance funds (as debt, not equity) to such a struggling start-up.

> [F]or a transfer of funds to be a debt rather than an investment there must be a reasonable expectation of repayment that does not depend solely on the success of the borrower's venture.  The unbroken losses of Mellody, both in its precorporate form and thereafter, are pointed to by defendant as proof that plaintiff could at no time have had a reasonable expectation that its advances would be repaid and that, ergo, they were necessarily investments in the future of the undertaking and rested on its ultimate success.  It is true that Mellody was a losing proposition from the start, but fledgling enterprises often experience losses in their formative periods when they are incurring expenses for programs designed to expand into eventually profitable operations. . . .  Cases abound where "indebtedness" was found despite the weak financial condition and operating losses of the debtor corporations.  [collecting cases]

American Processing & Sales Co. v. United States, 371 F.2d 842, 856-57 (Ct. Cl. 1967).

On appeal, DMA puts forth a theory that is difficult to accept; namely, that DWMC – knowing DMA would never be able to repay it – affirmatively chose to make ongoing equity investments in DMA over the course of several years, rather than simply allowing DMA to purchase vehicles and inventory (in part) on credit.  As observed by the court in American Processing, however, "Where the borrower is insolvent it is more credible that the lender would loan rather than invest, for a

creditor enjoys a certain priority to a stockholder in the event of liquidation." Id. at 857; accord James M. Wilton & Stephen Moeller-Sally, Debt Recharacterization Under State Law, 62 Bus. Law. 1257, 1265-66 (2007) ("But if a corporation is insolvent, no rational investor would choose to buy equity that is 'out of the money' and most likely worthless.  At the very least, one would think that insolvency should be viewed as evidence supporting an investor's assertion that it was legitimately concerned about repayment of its advance and intended that the advance would be treated as debt.").

Accordingly, the bankruptcy court did not clearly err in finding that this factor does not materially weigh in favor of recharacterization.

### (g)   Identity of Interest Between the Creditor and the Stockholder (Factor 6)

The identity-of-interest factor typically comes into play when multiple creditors make "loans" to a debtor corporation in amounts that are proportional to their respective equity ownership, suggesting that the purported loans were, in fact, additional equity investments.  See, e.g., Gilbert v. Commissioner, 248 F.2d 399, 407 (2d Cir. 1957) ("An agreement to keep 'loans' proportioned to acknowledged risk capital is indicative that the funds 'loaned' were understood to have been placed at the risk of the business [as equity investments]. . . .  In other words, a [shareholder's] reluctance to 'lend' money to the corporation unless his fellow shareholders 'lend' proportionate amounts belies a feeling of confidence that the funds will be returned regardless of the success of the venture.").  Here, DWMC was the sole shareholder. Accordingly, this factor is largely irrelevant.

1    Moreover, at the time of the relevant transactions, DWMC already
2    owned 100% of the stock in DMA.  Accordingly, DWMC had no incentive to
3    make an equity investment in DMA rather than a loan.  See Hardman, 827
4    F.2d at 1413 ("If a stockholder's percentage interest in the
5    corporation or voting rights increase as a result of the transfer, it
6    will contribute to a finding that the transfer was a contribution to
7    capital rather than a sale.").

8    Accordingly, the bankruptcy court did not clearly err in finding
9    that this factor does not materially weigh in favor of
10   recharacterization.

11            **(h)   The Security, if any, for the Advances (Factor 7)**

12   As discussed above, the transactions at issue in this case were
13   not simply loans, for which courts generally expect there to be some
14   form of security (i.e., collateral).  Instead, DMA purchased vehicles
15   and parts from DWMC, and DWMC allowed DMA to make these purchases, in
16   part, on credit.  DMA paid DWMC for 93.9% of the vehicles and parts
17   that it purchased during the relevant time period.  Thus, there appears
18   to have been little need for further "security" with respect to these
19   transactions.  Moreover, DWMC has presented no evidence - or argued in
20   this appeal - that security typically is provided in connection with
21   "trade accounts payable [incurred] in the ordinary course of business,"
22   such as those at issue in this case.[8]  (See 1 ER 14, Judgment at ¶ 33).

23   Accordingly, the bankruptcy court did not clearly err in finding

24

25   _____

     [8]

26   Moreover, once PPM extended a line of credit to DMA, DWMC required that
     DMA pay for 70% of its purchases upfront, and extended credit only as
27   to 30% of the purchase price.  This 70% upfront-payment requirement can
     be viewed as a form of "security" for the remaining 30%, which DMA
28   purchased on credit.

1    that this factor does not materially weigh in favor of

2    recharacterization.

###           (i)   DMA's Ability to Obtain Financing From Outside
###                   Lending Institutions (Factor 8)

5          "If no reasonable creditor would have sold property to the

6    corporation with payments to be made in the future, an inference arises

7    that a reasonable shareholder would not do so either." Hardman, 827

8    F.2d at 1414.  As noted above, the bankruptcy court found that DMA

9    ultimately paid for 93.9% of the vehicles and parts that it purchased

10   from DWMC during the relevant time period.  Given this payment record,

11   DWMC's willingness to engage in these transactions (and to allow DMA to

12   make its purchases, in part, on credit) does not appear to have been

13   unreasonable.

14         Accordingly, the bankruptcy court did not clearly err in finding

15   that this factor does not materially weigh in favor of

16   recharacterization.

###           (j)   The Extent to Which the Advances Were Subordinated
###                   to the Claims of Outside Creditors (Factor 9)

19         "Subordination of advances to claims of all other creditors

20   indicates that the advances were capital contributions and not loans."

21   In re Autostyle Plastics, Inc., 269 F.3d at 752.  Here, DWMC agreed to

22   subordinate its position as to one creditor, PPM, but did not agree to

23   subordinate its position as to any other creditors of DMA (of which

24   there were many).  Moreover, DWMC agreed to subordinate its position to

25   PPM on the express condition that DMA immediately begin paying for 70%

26   of its purchases upfront.  This is strong evidence that DMA did, in

27   fact, intend that DMA pay DWMC for the vehicles and parts that DMA was

28

purchasing.

Accordingly, the bankruptcy court did not clearly err in finding that this factor does not materially weigh in favor of recharacterization.

### (k)   The Extent to Which the Advances Were Used to Acquire Capital Assets (Factor 10)

Here, the "advances" were not used to acquire capital assets. They were used to purchase inventory (*i.e.*, vehicles and parts) for the purpose of resale by DMA. Accordingly, this factor weighs against recharacterization.

### (l)   The Presence of a Sinking Fund to Provide Repayments (Factor 11)

"A sinking fund is 'a fund consisting of regular deposits that are accumulated with interest to pay off a long-term debt.'" <u>Turkmani v. Republic of Bol.</u>, 193 F. Supp. 2d 165, 167 (D.D.C. 2002) (quoting Black's Law Dictionary, 682 (7th ed. 1999)). As a general matter, "[t]he failure to establish a sinking fund for repayment is evidence that the advances were capital contributions rather than loans." <u>AutoStyle Plastics</u>, 269 F.3d at 753.

DMA did not establish a sinking fund. Given the nature of the transactions at issue in this case, and the fact that DMA paid for 93.9% of the inventory at issue, however, this factor does not appear to be relevant. DWMC does not address this factor on appeal.

Accordingly, the bankruptcy court did not clearly err in finding that this factor does not materially weigh in favor of recharacterization.

**(m) Conclusion**

In light of the analysis above, the bankruptcy court did not clearly err in finding: "[C]onsidering all relevant factors, the evidence is overwhelming that the parties[] intended the amounts DMA owed to DWMC for vehicles and parts to be debt." (1 ER 26, Judgment at ¶ 60).

DMA argues that the bankruptcy court erred in overemphasizing certain factors (including the names given to the instruments, and the objective intent of the parties), while improperly ignoring or minimizing the importance of other factors. (See Reply, at 7). In the Court's view, however, the bankruptcy court properly tailored its analysis to the unique facts and economic circumstances of this case. See Hardman, 827 F.2d at 1412 ("No one factor is decisive. The court must examine the particular circumstances of each case. 'The object of the inquiry is not to count factors, but to evaluate them.'") (quoting Bauer, 748 F.2d at 1368); accord In re SubMicron Sys. Corp., 432 F.3d at 456 ("No mechanistic scorecard suffices."). The bankruptcy court did not err – much less clearly err – in its weighing of the relevant factors, nor did it clearly err (as discussed above) in its analysis of any individual factor.

Accordingly, the bankruptcy court's denial of DMA's claim for recharacterization is AFFIRMED.

**B.  Alleged Breach of Contract by DWMC for Failure to Deliver Parts and Vehicles to DMA**

DMA contends that DWMC breached the Distribution Agreement by failing to supply DMA with vehicles and parts. The bankruptcy court separated this claim into two different time periods. With respect to

the period of time *after* DWMC entered into reorganization proceedings in South Korea and sold its assets to GM (pursuant to the MTA), the bankruptcy court granted DWMC's Motion for Summary Judgment on this claim on the basis of collateral estoppel.  In particular, the bankruptcy court held that DMA was precluded from raising this issue on the basis of the Eleventh Circuit's decision in <u>Daewoo Motor Am. v. GMC</u>, 459 F.3d 1249 (11th Cir. 2006) (affirming the district court's order dismissing DMA's claims against GM, GMDAT and other defendants on the ground of international comity, holding that these claims constituted an impermissible collateral attack on the Korean court's approval of the sale of DWMC's assets to GM).  (<u>See</u> 1 ER 215, Order Granting in Part DWMC's Motion for Summary Judgment, at ¶ (1)(i)).

With respect to the period of time *before* DWMC sold its assets to GM, the bankruptcy court held, after conducting a four-day bench trial:

> DWMC did not breach the Distribution Agreement by failing to deliver vehicles and parts to DMA. . . .  To the extent DMA claims that DWMC failed to deliver vehicles and parts prior to [DWMC's sale of its assets to GM], that claim is rejected for three independent reasons.  First, DMA cannot prevail on this claim because, as described above, it failed to perform its own obligations to pay for the vehicles and parts previously delivered by DWMC.  Second, the evidence demonstrates that DMA already had a large inventory of vehicles and there was no evidence that DMA ordered parts that were not provided.  Third, even if DWMC had failed to deliver vehicles to DMA, that would have caused DMA no harm.  DMA was losing money on its existing vehicle inventory because it was selling them at depressed prices that were less than the prices DMA paid DWMC for the vehicles.  Therefore, if anything, DMA saved money by not having yet more vehicles that it would then have had to sell at a loss.

(1 ER 26-27, Judgment at ¶ 62 (internal citations omitted)).

DMA appeals the bankruptcy court's ruling only with respect to the period of time *after* DWMC sold its assets to GM, contending that the bankruptcy court erred in granting summary judgment with respect to

1  this claim on the ground of collateral estoppel. (See Opening Brief,
2  at 96-107). This Court, however, need not reach the question of
3  collateral estoppel. See O'Guinn v. Lovelock Correctional Ctr., 502
4  F.3d 1056, 1059 (9th Cir. 2007) ("We may affirm on any ground present
5  in the record.").
6      With respect to the period of time *before* DWMC sold its assets to
7  GM, the bankruptcy court found that DMA's breach of contract claim
8  against DWMC failed because, *inter alia*, DMA was in material breach of
9  the Distribution Agreement, having failed to pay DWMC for more than
10 $200 million in vehicles and parts. This finding is equally applicable
11 to the period of time *after* DWMC sold its assets to GM Daewoo. On
12 appeal, DMA argues that it was not in material breach of the
13 Distribution Agreement, because its debt to DWMC should have been
14 recharacterized as an equity investment. (See Reply, at 77). As
15 discussed above, however, the bankruptcy court properly found that
16 DMA's debt should not be recharacterized in this manner. Accordingly,
17 DMA was in material breach of the Distribution Agreement, and,
18 therefore, its breach of contract claim against DWMC (under the same
19 Distribution Agreement) fails. See generally Oasis West Realty, LLC v.
20 Goldman, 51 Cal. 4th 811, 821 (2011) ("the elements of a cause of
21 action for breach of contract are (1) the existence of the contract,
22 (2) **plaintiff's performance or excuse for nonperformance,**
23 (3) defendant's breach, and (4) the resulting damages to the
24 plaintiff.") (emphasis added).
25     Accordingly, the bankruptcy court's judgment against DMA on DMA's
26 counterclaim for breach of contract by DWMC for failure to deliver
27 parts and vehicles to DMA is AFFIRMED.
28

### C.   Recoupment

The bankruptcy court found that under the Distribution Agreement and related audit confirmation letters, DWMC agreed to reimburse DMA for certain warranty and free maintenance expenses. (1 ER 17, Judgment at ¶ 41). In particular, the bankruptcy court found that, as of the Petition Date, DWMC owed DMA $22,708,265.36 in warranty expenses and $15,852,160.97 in free maintenance expenses. (1 ER 18, Judgment at ¶ 43). The bankruptcy court held, however, that DWMC was entitled to "recoup" these amounts against the (far greater) amounts that DMA owed DWMC for vehicles and parts under the Distribution Agreement. (1 ER 27, Judgment at ¶ 63).

On appeal, DMA argues that recoupment was improper.

### 1.   Standard of Review

"The doctrine of recoupment is equitable in nature, and its use by the bankruptcy court is permissive and reviewed for an abuse of discretion." Aalfs v. Wirum (In re Straightline Invs.), 525 F.3d 870, 882 (9th Cir. 2008) (quoting Oregon v. Harmon (In re Harmon), 188 B.R. 421, 424 (B.A.P. 9th Cir. 1995) (citing Pieri v. Lysenko (In re Pieri), 86 B.R. 208, 210 (B.A.P. 9th Cir. 1988)) (alterations omitted).[9]

### 2.   Discussion

In the Ninth Circuit, "[f]or recoupment to apply, the competing claims must arise out of the same transaction or occurrence." In re Coast Grain Co., 317 B.R. 796, 807 (Bankr. E.D.Cal. 2004) (citations and internal quotation

---

[9]
Citing non-binding authority, DMA contends that the proper standard of review is de novo. This Court is bound, however, by the Ninth Circuit's unequivocal holding in Aalfs v. Wirum (In re Straightline Invs.), 525 F.3d 870, 882 (9th Cir. 2008) that the proper standard of review is for abuse of discretion. In any event, the Court would affirm the bankruptcy court's holding under the de novo standard advocated by DMA.

marks omitted).   "[T]he crucial factor in determining whether two events are part of the same transaction[,]" according to the Ninth Circuit, is whether there "is [a] 'logical relationship' between the two." *TLC Hosps.*, 224 F.3d at 1012 (citation omitted).   "The word 'transaction' is given both a liberal and flexible construction[]" under that standard. *Conrad*, 2007 Bankr. LEXIS 3757, 2007 WL 3273441, at *5 (citing *Madigan*, 270 B.R. at 755).   Consequently, "a 'transaction' may include 'a series of many occurrences, depending not so much upon the immediateness of their connection as upon their logical relationship.'"   *TLC Hosps.*, 224 F.3d at 1012 (quoting *Moore v. New York Cotton Exch.*, 270 U.S. 593, 610, 46 S.Ct. 367, 70 L.Ed. 750 (1926)). Therefore, "[c]ourts applying this standard 'have permitted a variety of obligations to be recouped against each other, requiring only that the obligations be sufficiently interconnected so that it would be unjust to insist that one party fulfill its obligation without requiring the same of the other party.'"   *In re Coast Grain Co.*, 317 B.R. at 807 (quoting *Madigan*, 270 B.R. at 755 (other citation omitted)). So although "[r]ecoupment often arises in contract cases, it is not limited to contractual obligations, nor must the amount to be recouped be liquidated in order for the right to apply."   *Id.* at 806 (emphasis added).

In re Petersen, 437 B.R. 858, 872 (D. Ariz. 2010).

In this case, the bankruptcy court did not abuse its discretion in holding that recoupment was appropriate.   There clearly was a "logical relationship" between DMA's purchase of vehicles (under the Distribution Agreement) and DWMC's agreement to reimburse certain warranty and free maintenance expenses in connection with these same vehicles (under the Distribution Agreement and related audit confirmation letters).   These transactions were "sufficiently interconnected so that it would be unjust to insist that one party fulfill its obligation without requiring the same of the other party." See In re Petersen, 437 B.R. at 872.

Accordingly, the bankruptcy court's order with respect to recoupment is AFFIRMED.[10]

---

[10]
In addition to failing on the merits, it appears that DMA waived its

### D.   Amount of Unpaid Warranty Expenses

DWMC admitted to the bankruptcy court that, as of the Petition Date, it owed DMA $22,708,265.36 in unpaid warranty expenses. (1 ER 17, Judgment, at ¶ 41).  DMA argued at trial that DWMC actually owed $30,753,095.45 in unpaid warranty expenses.  (Id.).  The bankruptcy court found that DMA had failed to satisfy its evidentiary burden with respect to this amount.  (See 1 ER 17, Judgment, at ¶¶ 42-43).  This finding was not clearly erroneous.  See Marsu, B.V. v. Walt Disney Co., 185 F.3d 932, 938 (9th Cir. 1999) ("We review a district court's computation of damages for clear error.").

Accordingly, the bankruptcy court's finding that, as of the Petition Date, DWMC owed DMA $22,708,265.36 in unpaid warranty expenses is AFFIRMED.

### E.   Consequential Damages and Prejudgment Interest to DMA

Because the Court has affirmed the bankruptcy court's ruling that DWMC did not breach the Distribution Agreement, DMA's claims for: (1) consequential damages; and (2) prejudgment interest, which are based on DWMC's purported breach of this agreement, necessarily fail.

Accordingly, the bankruptcy court's order that DMA is not entitled to either prejudgment interest or consequential damages is AFFIRMED.

### F.   Prejudgment Interest to DWMC

The bankruptcy court found that DWMC was entitled to prejudgment interest in the amount of $33,962,113.53.  (1 ER 28, Judgment at ¶¶ 65-67).  This amount was calculated by applying the interest rate specified in the underlying D/A agreements (LIBOR plus 6%) to the

---

arguments regarding recoupment by failing properly to raise them to the bankruptcy court in the first instance.  (See Opposition, at 57).

amounts due for vehicles and parts purchased by DMA, from the point in time at which they were due until the Petition Date.   (1 ER 28, Judgment at ¶ 65).

### 1.   Waiver of Interest

Before the bankruptcy court, DMA argued:   "Your Honor, we respectfully submit there was no agreement to pay interest.   There was, in fact, a contrary agreement that interest wouldn't be approved."   (8 ER 2131).   The bankruptcy court disagreed, finding that there was "no evidence of an agreement between the parties that interest on overdue amounts would not accrue."   (1 ER 28, Judgment at ¶ 65).

On appeal, DMA has taken a different position.   DMA now concedes that there was, in fact, an agreement to pay interest, but argues that DWMC *waived* its right to collect any such interest.   (See generally Reply at 45).   DMA failed to raise the issue of waiver before the bankruptcy court, and, therefore, cannot pursue this claim for the first time on appeal.   See Transwestern Pipeline Co. v. 17.19 Acres of Prop. Located in Maricopa County, 627 F.3d 1268, 1272 n.6 (9th Cir. 2010) ("[Appellant] did not raise this argument in the district court, however, and we therefore decline to consider it here.").

In the alternative, to the extent that DMA effectively raised the issue of waiver at trial, the bankruptcy court did not clearly err in finding that no such waiver occurred.   See Kern Oil & Refining Co. v. Tenneco Oil Co., 840 F.2d 730, 736 (9th Cir. 1988) ("The question of waiver of a contractual right is also a question of fact and subject to the clearly erroneous standard.").

### 2.   Incorrect Calculation of Interest

DMA also argues that the bankruptcy court erred in calculating the

1  amount of prejudgment interest owed to DWMC.  According to DMA, the

2  interest calculation was based on the wrong principal amount and

3  applied the wrong interest rate.  (Opening Brief, at 63).

4      At a *post-trial* hearing, DMA attempted to raise this issue to the

5  bankruptcy court for the first time.  (See 8 ER 2108 *et seq.*).  The

6  bankruptcy court subsequently held, however, that "[a]lthough DMA

7  challenged whether DWMC was entitled to interest at all, DMA did not

8  adequately preserve a challenge to the contractual rate of interest or

9  the interest calculations in DWMC's Proof of Claim."  (1 ER 28,

10 Judgment at ¶ 66 (citing the Second Joint Pretrial Order); see also

11 Opening Brief, at 65 (DMA conceding on appeal that it "did not argue in

12 the bankruptcy court that interest was calculated on the wrong

13 principal.")).  The bankruptcy court further found:  "Even if the issue

14 had been preserved, DMA has not adequately challenged the interest

15 calculations in DWMC's Proof of Claim."  (Id.).

16     Because DMA failed properly to raise this issue before the

17 bankruptcy court, this Court declines to address the propriety of the

18 interest calculations in DWMC's Proof of Claim on appeal.  See

19 Transwestern Pipeline Co., 627 F.3d at 1272, n.6.  In the alternative,

20 the bankruptcy court did not clearly err in finding that DMA failed

21 adequately to demonstrate that the interest calculations in DWMC's

22 Proof of Claim were incorrect.  See generally Walt Disney Co., 185 F.3d

23 at 938 ("We review a district court's computation of damages for clear

24 error.").

25     **G.   Equitable Subordination**

26     DMA contends that the bankruptcy court erred in granting DWMC's

27 motion to dismiss DMA's counterclaim for equitable subordination.  (See

28

1 ER 231, Order Granting in Part DWMC's Motion to Dismiss, at ¶ 3).
The standard of review is *de novo*. Hebbe v. Pliler, 627 F.3d 338, 341
(9th Cir. 2010).

DMA argues that its Second Amended Objection to DWMC's Proof of
Claim sufficiently alleged two independent factual bases for a claim of
equitable subordination:  (1) DWMC's failure to pay certain warranty
expenses; and (2) Misrepresentations by GM and DWMC regarding GM's
intent to include DMA in its purchase of DWMC's assets.

Each of these purported bases is discussed below.

### 1.    Failure to Reimburse Warranty Expenses

In its Second Amended Objection, DMA alleged that DWMC breached
its contractual obligation to reimburse DMA for certain warranty-
related expenses.  (See 19 ER 4929-33, at ¶¶ 34, 46, 48, 50).  Absent
more, however, a simple breach of contract is insufficient to support a
claim of equitable subordination.  See Kham & Nate's Shoes No. 2, Inc.
v. First Bank of Whiting, 908 F.2d 1351, 1357 (7th Cir. 1990)
("'Inequitable conduct' in commercial life means breach *plus* some
advantage-taking[.]") (emphasis in original); In re 604 Columbus Ave.
Realty Trust, 968 F.2d 1332, 1360 (1st Cir. 1992) (affirming finding of
equitable subordination where a bank had committed a "substantial"
breach of contract *and* engaged in further "advantage-taking," reasoning
"the fact that the Bank advanced and withdrew loan proceeds
arbitrarily, and at the same time caused interest to run on
misappropriated proceeds, in our view rises to the level of 'advantage-
taking' within the meaning of *Kham & Nate's Shoes*."); In re CTS Truss,
Inc., 868 F.2d 146, 148 (5th Cir. 1989) (holding a bank's alleged
breach of an oral agreement to extend further financing did "not fall

within any of the classic patterns of conduct that have led the courts to fashion the extraordinary remedy of equitable subordination").

Moreover, DMA argues on appeal that "[t]his Court can properly consider the facts developed at trial in deciding whether [DMA] would be able to successfully amend its counterclaim[.]" (Reply, at 49 (citing Sidebotham v. Robison, 216 F.2d 816, 826 (9th Cir. 1954)). As discussed above, after a four-day bench trial, the bankruptcy court properly found that DWMC had *not* breached its contractual obligation to reimburse DMA for warranty-related expenses (the same purported breach upon which DMA's claim of equitable subordination was based), finding that DWMC was equitably entitled to recoup its unpaid warranty expenses against the (far greater) amounts that DMA owed to DWMC for vehicles and parts under the Distribution Agreement. Accordingly, any amendment of DMA's counterclaim for equitable subordination based on the failure to reimburse warranty expenses undoubtedly would be futile.

### 2. Misrepresentations Regarding the Purchase of DMA by GM

In its Second Amended Objection, DMA alleged that both GM and DWMC misrepresented to DMA that DMA would be included in GM's purchase of DWMC's assets. (19 ER 4928, at ¶¶ 28-29). Among other misrepresentations cited by DMA, in September 2001, DWMC and GM entered into a non-binding Memorandum of Understanding, which provided for the sale of DWMC's assets, *including* DMA, to GM. (19 ER 4928, at ¶ 28). On April 30, 2002, however, GM and DWMC (and certain of DWMC's creditors) entered into the Master Transaction Agreement ("MTA"), pursuant to which GM purchased certain assets of DWMC, *excluding* DMA, and transferred these assets to GMDAT. (See 19 ER 4928, at ¶¶ 33).

On appeal, DMA contends that the above-described allegations were

sufficient to support a claim against DWMC for equitable subordination. The bankruptcy court dismissed this claim, however, under the doctrine of collateral estoppel, holding that DMA was precluded from re-raising this issue, which already had been decided against it in <u>Daewoo Motor America, Inc. v. General Motors Corp.</u>, 315 B.R. 148 (M.D. Fla. 2004), *affirmed*, 459 F.3d 1249 (11th Cir. 2006) (the "GM Litigation").

### (a)   Standard of Review and Legal Framework

Whether collateral estoppel is available is a mixed question of law and fact subject to *de novo* review.  Once the availability of collateral estoppel is determined, a district court's decision to apply collateral estoppel is reviewed for abuse of discretion.  Under the federal standard, to foreclose relitigation of an issue under collateral estoppel, three elements must be met:

(1) the issue at stake must be identical to the one alleged in the prior litigation; (2) the issue must have been actually litigated [by the party against whom preclusion is asserted] in the prior litigation; and (3) the determination of the issue in the prior litigation must have been a critical and necessary part of the judgment in the earlier action.

<u>Town of N. Bonneville v. Callaway</u>, 10 F.3d 1505, 1508 (9th Cir. 1993) (quoting <u>Clark v. Bear Stearns & Co.</u>, 966 F.2d 1318, 1320 (9th Cir. 1992)) (internal citations omitted).

In the Ninth Circuit, courts evaluate four factors in determining whether an issue is sufficiently "identical" to a previously-litigated issue for purposes of collateral estoppel:

(1) is there a substantial overlap between the evidence or argument to be advanced in the second proceeding and that advanced in the first?

(2) does the new evidence or argument involve the application of the same rule of law as that involved in the prior proceeding?

(3) could pretrial preparation and discovery related to the matter presented in the first action reasonably be expected to have embraced the matter sought to be presented in the second?

(4) how closely related are the claims involved in the two
proceedings?

<u>Kamilche Co. v. United States</u>, 53 F.3d 1059, 1062 (9th Cir. 1995)

(quoting Restatement (Second) of Judgments § 27 cmt. c).

### (b)   The GM Litigation

In the GM Litigation, DMA asserted a variety of claims against
General Motors Corp. ("GM"), GM Daewoo Auto & Technology Co. ("GMDAT"),
and other defendants. <u>See id</u>. In its complaint, DMA alleged, *inter
alia*, that GM misrepresented to DMA that DMA would be included in the
assets that GM intended to purchase from DWMC. (<u>See</u> 6:04-cv-201,
Dkt. 1, GM Litigation Complaint, at ¶¶ 24-51). One of the alleged
misrepresentations cited in the complaint was the Memorandum of
Understanding between GM and DWMC, which contemplated that DMA would be
included in the assets purchased by GM. (<u>Id.</u> at ¶ 61(b)). Based on
this (and other) misrepresentations, DMA asserted a claim of fraud
against GM. (<u>Id.</u> at ¶¶ 60-66). DMA further asserted a claim of Aiding
and Abetting Breach of Fiduciary Duty Against GM, alleging that "a
fiduciary relationship existed between [DWMC] and its wholly-owned
subsidiary DMA," and with GM's assistance, "[DWMC] breached its
fiduciary duty when it, among other things, participated in, assisted
with, and approved [the MTA]." (<u>Id.</u> at ¶¶ 83-89). Finally, DMA
alleged a claim for Successor Liability against GMDAT, as the
successor-in-interest to DWMC. (<u>Id.</u> at ¶¶ 104-110).

The district court held that all of DMA's claims were barred under
the doctrine of international comity, based on the Korean court's
approval of DWMC's Modified Reorganization Plan, which expressly
incorporated the terms of the MTA. The court found that "[b]ecause DMA

1  had notice of the Modified Plan, failed to vote on it, and chose not to

2  object to it, DMA effectively consented to the Modified Plan.  GM

3  Litigation, 315 B.R. at 159.  The court then held:

4      DMA had notice, as well as a full and fair opportunity to
       participate in all facets of the Korean bankruptcy
5      process. . . .  If DMA objected to the relevant transactions
       and orders, it should have done so before the Korean
6      tribunal. . . .  The fact that DMA now seeks to hold GMDAT
       liable as the successor of DWMC highlights DMA's true
7      intention – to collaterally attack the entire Korean
       reorganization process and result.  This Court will not
8      permit such an improper collateral attack to undo the Korean
       Court's efforts regarding the MTA and Modified Reorganization
9      Plan.

10 GM Litigation, 315 B.R. at 161.

11     On appeal, the Eleventh Circuit affirmed.  The court of appeals

12 rejected DMA's argument that the claims at issue had not been raised in

13 the Korean bankruptcy proceeding, holding:

14     The claims of [DMA] arise out of the same nucleus of
       operative facts considered by the Korean court.  The claims
15     of [DMA] are based on the Modified Reorganization Plan and
       MTA, which were approved by the Korean court. . . .  The
16     complaint of Daewoo America regarding the effect of the MTA
       should have been raised before the Korean court.  [DMA]
17     cannot now collaterally attack that order[.]

18 GM Litigation, 459 F.3d at 1259; see also id. at 1260 ("The complaint

19 of [DMA] turns on what happened in the Korean bankruptcy proceeding and

20 is inextricably intertwined with the order of the Korean court.").

21              (c)  Discussion

22     In this appeal, DMA argues that the issues raised in the GM

23 Litigation were not "identical" to the equitable subordination claim

24 raised here, and, therefore, collateral estoppel cannot apply.  The

25 Court disagrees.

26     In the GM Litigation, the Eleventh Circuit held, *inter alia*, that

27 DMA's fraud claim, which was based on alleged misrepresentations made

28

in connection with the MTA, constituted an impermissible collateral attack on the Korean bankruptcy court's order approving the MTA.  Under precisely this same reasoning, DMA's claim for equitable subordination in this case, which is based on alleged misrepresentations made in connection with the MTA, necessarily constitutes an impermissible collateral attack on the Korean bankruptcy court's approval of the MTA. Although DMA's claim of fraud in the GM Litigation was against GM, DMA also asserted a claim against GMDAT as the successor-in-interest of DWMC, and specifically alleged that DWMC had breached its fiduciary duty to DMA by entering into the MTA.  Accordingly, DMA's equitable subordination claim is sufficiently "identical" to the claims considered, and rejected, by the Eleventh Circuit in the GM Litigation to warrant the application of the doctrine of collateral estoppel.  See Kamilche, 53 F.3d at 1062.

In addition, this Court agrees with the reasoning underlying the Eleventh Circuit's decision in the GM Litigation.  Having consented to the MTA in DWMC's Korean bankruptcy proceedings, DMA should not be permitted to make a belated (albeit indirect) collateral attack on the MTA in its own bankruptcy proceedings.  See generally GM Litigation, 315 B.R. at 157 ("In the bankruptcy context, the doctrine [of comity] is especially applicable, for comity enables a debtor's assets to be dispersed equitably and systematically rather than haphazardly or erratically.") (citing International Trans., Ltd. v. Embotelladora Agral Regiomontana, 347 F.3d 589, 593 (5th Cir. 2003)).

Accordingly, the bankruptcy court's order dismissing DMA's equitable subordination claim is AFFIRMED on the basis of both collateral estoppel (with respect to the GM Litigation) and

1 | international comity (with respect to DWMC's Korean bankruptcy
2 | proceedings).

3 | **IV.   CONCLUSION**

4 | For the reasons set forth above, the judgment of the bankruptcy

5 | court is AFFIRMED.

8 | IT IS SO ORDERED.

11 | DATED:  May 16, 2012

STEPHEN V. WILSON
UNITED STATES DISTRICT JUDGE